

**Nathan D. McMurray**
Special Counel

nmcmurray@advocatesny.com

225 Broadway, Suite 1902
New York, New York 10007

t. (716) 517-5506
f. (212) 285-1410

www.afjlaw.com

Friday, January 6, 2023

**To: Honorable Jeremiah McCarthy**

**Re: Bellavia v. Orleans County et al Motion to Dismiss (Strike) (1:22-cv-00842-JLS-JJM)**

Dear Honorable Judge McCarthy:

   We provide the following as evidence in support of our opposition to the plaintiff's motion to strike. We understand that the contents of this response are part of similar subject matter before the Court, and we therefore further understand that it may be subject to a similar evaluation by the Court. We submit it, however, respectfully and because the pending motion to strike makes the timeliness and relevance of this information of particular material significance to the outcome of this case going forward.

### 1.   SUMMARY OF RESPONSE

**The Comments in paragraphs 11 through 17 and 19 through 28 are relevant to our pleadings and therefore should not be stricken.**

   The issue before the court is whether to strike paragraphs 11 through 17 and 19 through 28 because they are scandalous. Those paragraphs certainly contain horrible comments of the crudest and most insulting nature. It is hard to read.

   Yet Mr. Bellavia said those things—as documented by hundreds of saved texts and videos—to his now ex-wife and children as part of strategy to intimidate, silence, and discredit them. We cite this limited selection of such comments not to scandalize, but because they are relevant to our pleadings.

   Paragraphs 11 through 17 and 19 through 28, even if deemed scandalous, are relevant because:

1. A review of paragraphs 11 through 17 and 19 through 28—and similar comments documented by recorded texts and calls—are relevant and necessary because those show a pattern of behavior by Mr. Bellavia; a lack of probable cause to arrest Ms. King (she was not the harasser or aggressor); and a motive and escalating plan by Mr. Bellavia to intimidate, silence, and discredit Ms. King; and



2. Paragraphs 11 through 17 and 19 through 28 are not barred by any obligation of confidentiality or non-disclosure because the arguments in Ms. King's pleadings do not violate any court order; and Mr. Bellavia comes to the court without "clean hands" himself having already defamed Ms. King in his recent, well publicized, internationally published book.

*Further, as part of this response we seek the right to amend our complaint to include the additional materials in this response, which further illustrate the points cited above.*

## 2. LEGAL STANDARDS

### 2.1 The court may strike pleadings that are redundant, immaterial, impertinent, or scandalous . . . but not if they are also relevant.

Under Fed.R.Civ.P. 12(f), the court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter" either on its own motion or that of a party. "The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that might arise from litigating spurious issues by dispensing with those issues prior to trial." See Fantasy, Inc. v. Fogerty, 984 F.2d 1524, 1527 (9th Cir.1993).

### 2.2 But even if a matter is scandalous, it may not be stricken if it is relevant.

If a matter is scandalous or prejudicial it will not be stricken if it is relevant to a cause of action in a complaint. Pisula v Roman Catholic Archdiocese of New York, 201 A.D.3d 88, 97, 159 N.Y.S.3d 458 (2d Dept. 2021); See also New York City Health & Hospitals Corp. v St. Barnabas Community Health Plan, 22 A.D.3d 391, 802 N.Y.S.2d 263 (1st Dept. 2005). Further, motions to strike are infrequently granted, only applicable when "it is clear that the allegation in question can have no possible bearing on the subject matter of the litigation." Cohen v. Elephant Wireless, Inc., No. 03 Civ. 4058, 2004 WL 1872421, at 2 (S.D.N.Y. Aug. 19, 2004).

## 3. ARGUMENT

### 3.1 A review of paragraphs 11 through 17 and 19 through 28—and similar comments documented by recorded texts and calls—are relevant and necessary because those show a pattern of behavior by Mr. Bellavia; a lack of probable cause to arrest Ms. King (she was not the harasser or aggressor); and a motive and escalating plan by Mr. Bellavia to intimidate, silence, and discredit Ms. King; and

A review is necessary to show the true context of Ms. King's unjust arrest. In none of the texts or calls does Ms. King threaten Mr. Bellavia. Mr. Bellavia however continually threatens, taunts, and disparages Ms. King, which eventually escalates and culminates in his plan to unjustly arrest Ms. King to intimidate, silence, and discredit her.



### 3.1 Mr. Bellavia's threatening texts escalated in the months prior to Ms. King's unjust arrest.

On September 20, 2020, Mr. Bellavia started a particularly intense series of threatening texts to Ms. King via a parenting app they had been ordered by the court to use to communicate regarding the children's well-being. I will quote only key portions of those texts, because of their lengthy nature. We eventually plan to submit all the texts—and dozens of similar pages of texts and comments that are like the ones that are the subject of this response—to illustrate Mr. Bellavia's intent to intimidate, silence, and defame Ms. King.

In the parenting application, Mr. Bellavia informs Ms. King that she is hurting him financially, a claim she denies. He tells her to stop and says, "I don't want to litigate you to be a decent human being." Ms. King reminds Mr. Bellavia of her First Amendment rights and responds, "Please stop threatening me. Use this app to talk about the kids. Thank you."

Mr. Bellavia nevertheless persists, saying in part, "I am asking you to stop bringing attention to your claims that are not in the interest of the kids and making difficult my attempts to pay your expenses." Ms. King again reminds Mr. Bellavia that the parenting application they are using is intended for communication about their children only, explaining that she is not harassing him and saying, "I just want to coparent and make our children happy." To which Mr. Bellavia responds in a threatening manner, "You are abusing this app . . . Let's see how life works out for you . . ." To which Ms. King immediately replies, "Let's see how life works out is another threat. Please stop threatening me. There is no need for it. I will see you at Tops at 5 and at 7:30. Thanks."

A month later—just a few months before Ms. King's unjust arrest in January—Mr. Bellavia again threatens Ms. King, seemingly hinting at revenge. Specifically, on October 4, 2020, he wrote in part, "You went public and became a professional victim. That boomerang hasn't hit you yet. But it always does. You built a little bonfire of gossiping townies. Had your fun. It always ends up burning you. You know that too. King luck is super strong in you." To which Ms. King responds, "I think you have accidentally gotten Vivi the wrong sized sneakers. They are too tight. She needs Air Force Ones . . ."

After another barrage of troubling texts on the recorded parenting application, on October 8, 2020, Mr. Bellavia states threateningly, "You think you can literally do anything you want. I will no longer be indicted by your implication. You have been warned, sanctioned by the court and instructed. You refuse to comply." To which Ms. King responds, "I have no idea what you are talking about." Of note, upon information and belief, Ms. King was never sanctioned by any court, ever.

The texts continue as Mr. Bellavia states plainly his primary concerns regarding his future career prospects in government and how Ms. King's free speech may harm him. on October 18, 2022, he states in part, "You have caused enormous damage. I can't afford to have

Case 1:22-cv-00842-JLS-JJM   Document 16   Filed 01/06/23   Page 4 of 9



any threat of law enforcement or anything else destroy my clearance." Further, he adds language indicating his intent to use the legal system to intimidate, silence, and discredit Ms. King, saying, "And I am going to have a judge intervene until you stay in your lane." Then, in a serious of texts similar to the pleadings that are the subject of this response, Mr. Bellavia states in part, that his life is "glorious."

In December, after another barrage of unpleasant texts by Mr. Bellavia, Mr. Bellavia demands on December 27, 2020, "Zero non children contact" with Ms. King. Ms. King says, "Every single thing I am discussing is about the children. Have a good night." To which Mr. Bellavia replies, incongruously, "I am outside Target and my car died. Can you give me a jump please."

In the days to come, Mr. Bellavia continues to threaten and claim, somehow, that Ms. King (not him) is violating the law. On December 31, 2022, Ms. King, raises the issue of their son's tuition and related costs at RIT. In response, in all caps Mr. Bellavia types, "NO MORE VIOLATIONS." In this series of texts, he also claims that Ms. King is trying to "shake him down." Ms. King responds, "Contacting you regarding concerns connected our children are NOT illegal or violations! I am going to mark January 9th on my calendar as the next visitation since you are unavailable during those weekdays. I am logging off until then."

Mr. Bellavia, nonetheless, continued to pretend that Ms. King was calling him and using the application incorrectly. In a final series of texts over the next month, Mr. Bellavia claims (without evidence) that Ms. King was trying to call him to harass him and using the parenting application incorrectly. On January 8. 2021 he texts, "You are going to get in trouble." Ms. King never called him, other than her having her son call him after repeated attempts to obtain health insurance information via the parenting application had failed.

Accordingly, Ms. King explained on December 31, 2021, "I haven't called you or had any non-children contact related with you, nor do I have a desire to call you. I only wanted the health insurance information you wouldn't give." And then, after another month of strange texts from Mr. Bellavia, on January 25, 2022—the day before Ms. King was called by Officer Corey Black to be arrested—she texted, "All of my communication is about our children. I text you about their health, well-being, and care, instead of cooperating, each time you threaten me on this app about an order. All that matters to me is to keep my children safe and happy. I want as little contact with you as possible." The day of her unjust arrest, Ms. King texted to update Mr. Bellavia on the children's development stating, "Basketball is resuming, we find out day to day when clinics will be." Mr. Bellavia responded without a hint of his actions to have Ms. King arrested, simply saying, "Thanks."

Of note, the courts were not critical of Ms. King's behavior in January 2022, as a routine review of these text exchanges (and the others cited in our complaint) would have demonstrated to any law enforcement. Conversely, the court appointed attorney for the children, Jake Whiting, asked honorable Charles Zambito to prevent Mr. Bellavia from seeing the children on his own

4



without supervision because the children felt harassed themselves by Mr. Bellavia—not Ms. King. The court granted Mr. Whiting's request on January 29, 2021, ordering that Mr. Bellavia's ". . . visitation with the parties' children is hereby immediately terminated and all writing or verbal contact between Plaintiff and the children shall be supervised or in a therapeutic setting."

### 3.2 The paragraphs cited in our compliant were used as an example of Mr. Bellavia's plan to intimidate, silence, and discredit Ms. King after Mr. Bellavia failed to silence Ms. King in their divorce proceedings.

Mr. Bellavia wanted Honorable Charles Zambito, who was overseeing their divorce proceedings, to force Ms. King to sign what amounted to a permanent gag order to prevent her from ever speaking about the abuse she and her children endured over their 21 years of marriage. Ms. King refused to voluntarily sign such an agreement, which caused great distress to Mr. Bellavia as seen in audio recordings from this time made by Ms. King. In those recordings, Mr. Bellavia threatens to ruin Ms. King's life and even put her in jail (comments that are directly relevant to this case) if she didn't sign a non-disclosure agreement.

Please see relevant excepts from these calls below:

**Call #1**

Ms. King: "I don't have to sign a non-disclosure agreement."

Mr. Bellavia: "I don't take your word for it. I'm going to lock you up.

**Call #2**

Ms. King: "So, you're telling me you're not abusive? You're not abusive?"

Mr. Bellavia: "I'm telling you if you use that word again you fucking cunt. I'm going to destroy you in a courtroom. I will sue the fucking shit out of you. And your cunt mom and toothless dad and all you motherfuckers that want to stand up. Line 'em up and I will buck 'em the fuck down. I will take that shoebox they live in and bulldoze it into a parking lot dude. I'm not fucking with you. I'm not fucking with them. You stay in your fucking lane and I will stay in mine."

When Ms. King continued to refuse to sign a non-disclosure agreement, Mr. Bellavia's divorce attorney, Joan Adams, asked the court to issue a broad protective order to silence Ms. King. The order, as first presented to the court, would have amounted to an almost complete restriction on Ms. King's First Amendment rights. Therefore, refusing to be silenced, Ms. King hired an attorney and objected to Mr. Bellavia's motion. Honorable Charles Zambito eventually

5



issued a very limited order on November 3, which recognized Ms. King's First Amendment rights, stating (in part):

> "Initially, I note that the Court lacks the authority to order the parties to enter into a 'confidentiality agreement,' as it does not appear that the parties can come to a meeting of the minds with respect to the parameter thereof."

Further, Charles Zambito stated in his February 3 order:

> " . . .  Court's discretion in fashioning a protective order is not unlimited, particularly where, as here, a party's First Amendment rights are implicated."

The November 3 order than concludes stating that the parties (neither Ms. King nor Mr. Bellavia) may disseminate materials obtained in discovery or contact business partners or associates directly without leave of the court. Ms. King has not done that. The texts cited in her complaint were not part of their divorce proceedings, because upon information and belief the court refused to consider those texts in his rulings. Further, we (as counsel for Ms. King) have not objected to the sealing of the divorce agreement or other related documents, including the complete versions of the orders by Honorable Charles Zambito cited herein.

### 3.3 If anyone, Mr. Bellavia broke Honorable Charles Zambito's order by publishing a book defaming Ms. King and masking his history of abuse and neglect

In his November 3 order, Honorable Charles Zambito demands that neither Ms. King nor Mr. Bellavia, ". . . demean or disparage the other in the presence of their children, or in any manner by which the parties' children are likely to become aware of same, either directly or indirectly, including by means of electronic platforms and or social media."

Ms. King has not broken that order. To claim that Ms. King has violated that order by making general comments regarding abuse and divorce or by filing her complaint before this court—including the paragraphs that Mr. Bellavia wants stricken—would make any legal action regarding Mr. Bellavia's efforts to silence, intimidate, and discredit Ms. King (leading ultimately to his efforts to have her unjustly arrested) impossible. Further, absent the direct direction of Mr. Bellavia, it is not reasonable that their minor children are likely to access Ms. King's complaint or other pleadings related to Ms. King's complaint—minors do not regularly use (for example) The Public Access to Court Electronic Records service. Mr. Bellavia and Ms. King's children are, however, would much more likely read a book published by an international publishing house like Harper Collins, especially when that book was publicized by an international press tour including television interviews, book signings, and podcasts.

As referenced above, November 8, 2022, Harper Collins Publishing released Mr. Bellavia's second book titled, "Remember the Ramrods: An Army Brotherhood in War and Peace." Among the mistruths in the books, Mr. Bellavia directly portrays Ms. King in a negative

6



light (as a cold, unsupportive, selfish woman) and falsely depicts the circumstances of their life and marriage—all of which would harm her in the eyes of their children. There are numerous examples of this within his book, among those examples are the following passages:

### 3.4 Mr. Bellavia uses his book to depict Ms. King as an unsupportive and selfish spouse.

In pages 71-75, Mr. Bellavia depicts Ms. King as a woman insistent on keeping their family apart, selfishly, for her career. Specifically, Mr. Bellavia claims that Ms. King failed to fill out paperwork or respond to emails to allow her and their newborn child (Evan) to stay with Mr. Bellavia during his active service in Germany. He also states that her career at a local news station (as a weekend news anchor, which is a job she never had) was her priority.

In the book Mr. Bellavia sates, "Leaving her job would have been a big step. My head understood that. But it wounded me nonetheless. Everywhere I looked, wives were sacrificing for their husbands deployed at war. They came to Germany, and in the morning, they would be free to explore Europe together." Further, the book mentions that Ms. King refused to cooperate somehow in helping Mr. Bellavia obtain a house in Germany for their family. Mr. Bellavia says that Ms. King sent him blank paperwork that she refused to fill out as some dramatic sign of her disinterest in traveling to Germany (see page 75).

The reality was that the decision for Ms. King to stay in New York had nothing to do with Ms. King's career. She was not a reporter at the time. She was an associate producer making $8 an hour, part time, trying to support herself alone, living with her parents without the companionship of her husband. Further, if Mr. Bellavia's email inbox was empty, it may have been because Ms. King (like many other Americans at that time) did not have a personal computer nor access to one she could use for personal purposes at work. She did, however, regularly send handwritten mail to Mr. Bellavia—none of which contained blank paperwork. Many of her letters, however, documented that the decision for Ms. King to stay stateside was based on David's fear of terrorism related to 9-11.

### 3.5 Mr. Bellavia also defames Ms. King in his book by claiming that she used their children against him, when in fact he was attempting to use their children against her

Pages 183 to 185 of the book describe, in part, the background interview Mr. Bellavia went through before he obtained his Medal of Honor. In those pages, he depicts himself as a salt of the earth type man—working in a milk factory and farming the land. It is out of "duty" he states that he did everything in his power to save his marriage to Ms. King, despite her attempts to use their children against him. Specifically, on page 184 he states, "Liz, I have three children. The kids have been told everything through their mother's eyes. Maybe now, this award. Maybe it will help them see me for who I really am."



Mr. Bellavia's book goes further to defame and paint Ms. King as a liar who is using their children against him. On page 203 he writes, "Walter had no idea I was traveling the exact same path. His pain, his worry. As I listened to him it was like hearing a testimonial to my own 0300 inner monologue. Why do people get so angry? I asked him. So bitter? Why would anyone use their children as a cudgel to punish the person they once loved? Sergeant Bell, there's a formula they use against guys like us. We're painted as the crazy . . ."

The reality is Ms. King supported Mr. Bellavia through his period of service in Iraq and Germany, multiple failed political campaigns, later periods of frequent and long absence from the family home, and a high-profile and controversial radio career. During the time of his interviews for the Medal of Honor, Ms. King and Mr. Bellavia were not engaged in any plans for divorce. In fact, she was supporting his efforts to obtain the award. She even traveled with Mr. Bellavia as his then spouse to the White House to receive the Medal of Honor.

4. **SUMMARY: We are asking the court to keep the pleadings, because the material continued within those paragraphs and in this response and motion to amend—which are derived from texts, calls, and comments surrounding this case—are what lead to Ms. King's arrest. Further, Mr. Bellavia has already wantonly disregarded any possibly relevant court order by publishing a book defaming Ms. King.**

From either Ms. King's perspective or Mr. Bellavia's perspective, it is impossible for the court or a potential jury to understand and evaluate this case (including whether Ms. King's arrest was justified) unless the texts, calls, and comments surrounding it—including potentially scandalous but relevant material—are fully envaulted, openly, and fairly. We are alleging in our pleadings that Mr. Bellavia cherry picked information and used a friend to create a false justification for Ms. King's arrest.

We kindly ask the court not to allow Mr. Bellavia to again cherry pick information and use the court system to intimidate, silence, and defame Ms. King. We therefore kindly again petition the court to keep the pleadings intact and to further allow us to amend our complaint to include the materials contained herein, which have been obtained after an intense review of the electronic records of Ms. King over the past few weeks. Let the whole story be seen and told, per the spirit of transparency contained in our judicial system.



Dated: January 6, 2023

                                          ADVOCATES FOR JUSTICE,
                                        CHARTERED ATTORNEYS

                                        By: /s/ *Nathan D. McMurray*
                                               Nathan D. McMurray
                                               225 Broadway, Suite 1902
                                               New York, New York 10007
                                               (716) 517-5506
                                               nmcmurray@advocatesny.com