UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

| | |
|---|---|
| DEANNA MARLENE BELLAVIA aka DEANNA KING, | Civil Action No. 22-842 |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ORLEANS COUNTY, ORLEANS COUNTY SHERIFF'S DEPARTMENT, ORLEANS COUNTY DISTRICT ATTORNEY, COREY BLACK, DEPUTY JOHN DOE, and DAVID BELLAVIA, | |
| Defendant. | |

-----------------------------------------------------------------X

Plaintiff DEANNA KING, by and through her attorneys, ADVOCATES FOR JUSTICE, CHARTERED ATTORNEYS, as and for this Complaint, alleges as follows:

**PARTIES**

1. Plaintiff, DEANNA KING, is a resident of Batavia, New York in Genesee County.

2. Defendants, ORLEANS COUNTY, ORLEANS COUNTY SHERIFF'S DEPARTMENT, and ORLEANS COUNTY DISTRICT ATTORNEY have an address of 14016 Route 31, West Albion, New York 14411.

3. Defendant COREY BLACK is an investigator for the Orleans County District Attorney's office. He is assigned to the Major Felonies Task Force, which according to the Orleans County District Attorney's website, the purpose the Orleans County Major Felony Crime Task Force is to, "combat the increasingly complex and disruptive issues of drug abuse, trafficking related violence and major felonious crimes within society." He is a former member former deputy

of ORLEANS COUNTY SHERIFF'S DEPARTMENT, and has a work address of 14076 Route 31, West Albion, New York 14411.

4. Defendant DEPUTY JOHN DOE is a deputy of Defendant ORLEANS COUNTY SHERIFF'S DEPARTMENT.

5. Defendant DAVID BELLAVIA is a resident of Florida and is Plaintiff's former spouse.

## FACTS RELEVANT TO ALL CLAIMS

6. Plaintiff is a well-known television and radio personality in the Rochester, New York area, with over 20 years-experience. She is the mother of three children. She resides in Batavia, New York.

7. Defendant Bellavia is rightwing political provocateur and radio host. His work focuses on culture issues and political flash points, such as conspiracies regarding COVID vaccines. He is most well-known, however, for receiving the Medal of Honor in 2019 from former President Donald Trump for heroics in Iraq.

8. Separately, he is staunch Trump supporter, having worked on this campaign in 2016. He parlayed notoriety from his association with Trump and known Trump associates including Michael Caputo and Carl Paladino into several lucrative contracts, book deals, and memberships on various boards. Bellavia is also known for several unsuccessful political campaigns. Defendant Black has worked with Defendant Bellavia on political matters, and is a fellow traveler in rural, New York political circles. Defendant Bellavia's political radio show broadcasts in Buffalo, New York, and the surrounding areas, where his children reside, but he is a current resident of Naples Florida.

9.  Plaintiff and Defendant Bellavia were married in 1999. In the early years of their marriage, Plaintiff and Defendant Bellavia lived apart because Defendant Bellavia was stationed overseas. They had a young child, the parties had little money, and Plaintiff did not have a passport.

10. During this time, Plaintiff wrote ink and paper love letters to Defendant Bellavia several times a week and often sent him care packages. The letters (some of which she has saved) included numerous recitations of the words "I love you" and "I miss you." Notably, Defendant Bellavia recognized Plaintiff's support in this first book, "House to House: An Epic Memoir of War."

11. Despite Plaintiff's attempts to support, Defendant Bellavia had flashes of aggression and abuse, which became more common over time.

**A.  Defendant Bellavia and his friends and political associates have spent years trying to silence, intimidate, and defame Plaintiff King.**

12. Since the early days of their marriage, Defendant Bellavia consistently berated and verbally abused Plaintiff in person. She felt threatened and fearful of Defendant Bellavia's conduct, which included hundreds of abusive text messages once they acquired mobile phones. Over time this abuse became increasingly more violent (throwing and breaking items and directing abuse toward Plaintiff and their children).

13. As examples, he called Plaintiff:

- "Ass hole,"
- "Cunt," (many times),
- "selfish bitch,"
- "lying cunt,"
- "disloyal worthless person," "fucking idiot,"
- "ungrateful piece of shit," "two-faced piece of shit,"
- "piece of shit,"
- "fucking scum bag,"

3

- "Fucking worthless,"
- "Fucking loser,"
- "evil fat troll,"
- "fucking tower of shame,"
- "bitch,"
- "fucking liar,"
- "raging cunt,"
- "lazy bitch,"
- "chubby whore,"
- "fucking moron,"
- "jealous fat cunt with chubby arms," "fucking wannabe,"
- "loser,"
- "freeloading cunt,"
- "dirty dirty whore."

14. Defendant repeatedly (in person, on video (documented), and through texts messages) threatened Plaintiff with violence and wished her harm, for example:

- "I will fucking gouge your eyes out with a Philips head,"
- "I hope you die" (repeatedly) and "fuck off,"
- "I literally hope you fall and lose all your teeth,"
- telling her to buy rope and hang herself,
- "I would literally do anything for you to have a frontal lobe transplant," 4
- "I hope you get herpes"
- And also threats that he could kill her and hide the evidence

15. Defendant Bellavia repeatedly mocked Plaintiff's struggles with bulimia, depression, and mental health, and insulted Plaintiff's family calling them "white trash," "loser underachieve[ers]," "autistic and ugly," and similar insults.

16. Defendant Bellavia also abused and insulted his own children, calling his sons "a lost cause," "fucking waste," "fucking moron," "fucking retard," "fucking idiot," "fucking serial killer," and stating "I can see her getting knocked up" about his 9-year-old daughter.

4

17. Plaintiff would engage with Bellavia to defend herself and her children, especially in situations when her children would hide from Defendant Bellavia's violent outbursts. Plaintiff's parents would also often intercede to ensure the safety of their daughter and grandchildren.

18. From 2019 to 2021, Plaintiff and Defendant Bellavia were thus engaged in a very contentious divorce.

19. During the divorce proceedings, Defendant Bellavia, continued his abusive behavior, and enlisted his friends and associates, including representatives of law enforcement and the US justice system, to harass and humiliate and discredit Plaintiff should she ever make evidence of their public in her defense.

20. Plaintiff and Defendant Bellavia's divorce was before Judge Charles Zambito, who knew Defendant Bellavia personally and even endorsed him for his run for Congress 2012.

21. Because of Defendant Bellavia's long-standing relationship with Judge Zambito, Plaintiff was distressed by the forum of her divorce, and feared that Judge Zambito would show preference toward Defendant Bellavia.

22. Repeatedly, throughout the course of the divorce proceedings, Judge Zambito ignored evidence of domestic abuse and extreme harassment by Defendant Bellavia—even attempting to pressure Plaintiff to sign a non-disclosure agreement regarding the divorce proceedings—which she refused.

23. For example, Plaintiff pleaded with Judge Zambito to stop Defendant Bellavia's limited visits with their children because they caused the children anxiety and fear during their interactions with their father.

24. At one point during the proceedings, Defendant Bellavia visited the Plaintiff and told her in front of her children, "Cunt, you're going to have to sell your house." Plaintiff then said

that a judge would never make her do that. Plaintiff recorded this and the recorded Defendant Bellavia's shrill response, "A judge? I got a judge! Bring it bitch!"

25.	Plaintiff then asked Defendant Bellavia if their judge was on Defendant Bellavia's "payroll." At that point, Defendant Bellavia noticed she was recording and smacked the phone out of her hand. He then left.

26.	Despite these incidents, like many of her other requests, Judge Zambito denied Plaintiff's request and allowed visits to continue.

27.	Thankfully, lawyers appointed on behalf of the children, intervened and asked the court to limit Defendant Bellavia's interaction with their two minor children.

28.	Also, because of Defendant Bellavia's continuing abuse and harassment of Plaintiff via text, and upon the recommendation of the children's legal representatives, the Court ordered Defendant Bellavia exclusively to use a parenting app ("App Close," which records all communications) to communicate with Plaintiff.

**B.	Defendant Bellavia attempted to use the courts to silence, intimidate, and defame Ms. King; when he failed, he moved to even more aggressive means.**

29.	Defendant Bellavia wanted to hide these facts from the public to protect his reputation. He therefore asked Honorable Charles Zambito, who was overseeing their divorce proceedings, to force Ms. King to sign what amounted to a permanent gag order to prevent her from ever speaking about the abuse she and her children endured over their 21 years of marriage.

30.	Ms. King refused to voluntarily sign such an agreement, which caused great distress to Defendant Bellavia as seen in audio recordings from this time made by Ms. King. In those recordings, Defendant Bellavia threatens to ruin Ms. King's life and even put her in jail (comments that are directly relevant to this case) if she didn't sign a non-disclosure agreement.

- Call #1 Ms. King: *"I don't have to sign a non-disclosure agreement."*
  Defendant Bellavia: *"I don't take your word for it. I'm going to lock you up."*

6

- Call #2 Ms. King: *"So, you're telling me you're not abusive? You're not abusive?"*
  Defendant Bellavia: *"I'm telling you if you use that word again you fucking cunt. I'm going to destroy you in a courtroom. I will sue the fucking shit out of you. And your cunt mom and toothless dad and all you motherfuckers that want to stand up. Line 'em up and I will buck 'em the fuck down. I will take that shoebox they live in and bulldoze it into a parking lot dude. I'm not fucking with you. I'm not fucking with them. You stay in your fucking lane and I will stay in mine."*

31. When Ms. King continued to refuse to sign a non-disclosure agreement, Defendant Bellavia's divorce attorney, Joan Adams, asked the court to issue a broad protective order to silence Ms. King. The order, as first presented to the court, would have amounted to an almost complete restriction on Ms. King's First Amendment rights. Therefore, refusing to be silenced, Ms. King hired an attorney and objected to Defendant Bellavia's motion.

32. Honorable Charles Zambito eventually issued a very limited order on November 3, which recognized Ms. King's First Amendment rights, stating (in part): "Initially, I note that the Court lacks the authority to order the parties to enter into a 'confidentiality agreement,' as it does not appear that the parties can come to a meeting of the minds with respect to the parameter thereof."

33. Defendant Bellavia filed for an order of protection against the plaintiff on December 10, 2020. Judge Zambito again denied his request. Concerned about his reputation and that he had a pending book deal, records will show Defendant Bellavia followed through on threats to "lock her up" and contacted his longtime friend Investigator Corey Black in Orleans County to help.

34. Defendant Bellavia's plan to arrest Plaintiff King with the assistance of Defendant Black came to pass after his legal strategies to silence, intimidate, and defame Ms. King. His frustration can be seen via a review of contemporaneous text messages on the parenting app, "App Close," which became increasingly threatening in the months prior to Ms. King's unjust arrest.

35.     Defendant Bellavia repeatedly warned Ms. King that he would "destroy her" if she did not sign a non-disclosure agreement concerning the abuse she endured for over twenty years. In one message he tells her to stop and says, *"I don't' want to litigate you to be a descent human being."* Ms. King reminds Defendant Bellavia of her First Amendment rights and responds, *"Please stop threatening me. Use this app to talk about the kids. Thank you."*

36.     Defendant Bellavia nevertheless persists, saying in part, "I am asking *you to stop bringing attention to your claims that are not in the interest of the kids and making difficult my attempts to pay your expenses."* Ms. King again reminds Defendant Bellavia that the parenting application they are using is intended for communication about their children only, explaining that she is not harassing him and saying, *"I just want to coparent and make our children happy."* To which Defendant Bellavia responds in a threatening manner*, "You are abusing this app . . . Let's see how life works out for you . . ."* To which Ms. King immediately replies, *"Let's see how life works out is another threat. Please stop threatening me. There is no need for it. I will see you at Tops at 5 and at 7:30. Thanks."*

37.     A month later—just a few months before Ms. King's unjust arrest in January—Defendant Bellavia again threatens Ms. King, seemingly hinting at revenge. Specifically, on October 4, 2020, he wrote in part, *"You went public and became a professional victim. That boomerang hasn't hit you yet. But it always does. You built a little bonfire of gossiping townies. Had your fun. It always ends up burning you. You know that too. King luck is super strong in you."* To which Ms. King responds*, "I think you have accidentally gotten Vivi the wrong sized sneakers. They are too tight. She needs Air Force Ones . . ."*

38.     After another barrage of troubling texts on the recorded parenting application, on October 8, 2020, Defendant Bellavia states threateningly, *"You think you can literally do anything*

8

*you want. I will no longer be indicted by your implication. You have been warned, sanctioned by the court and instructed. You refuse to comply."* To which Ms. King responds, *"I have no idea what you are talking about."*

39. Of note, upon information and belief, Ms. King was never sanctioned by any court, ever. The texts continue as Defendant Bellavia states plainly his primary concerns regarding his future career prospects in government and how Ms. King's free speech may harm him.

40. On October 18, 2022, he states in part, *"You have caused enormous damage. I can't afford to have any threat of law enforcement or anything else destroy my clearance."* Further, he adds language indicating his intent to use the legal system to intimidate, silence, and discredit Ms. King, saying, *"And I am going to have a judge intervene until you stay in your lane."* Then, in a serious of texts similar to the pleadings that are the subject of this response, Defendant Bellavia states in part, that his life is "glorious."

41. In December, after another barrage of unpleasant texts by Defendant Bellavia, Defendant Bellavia demands on December 27, 2020, *"Zero non children contact"* with Ms. King. Ms. King says, *"Every single thing I am discussing is about the children. Have a good night."* To which Defendant Bellavia replies, incongruously, *"I am outside Target and my car died. Can you give me a jump please."*

42. In the days to come, Defendant Bellavia continues to threaten and claim, somehow, that Ms. King (not him) is violating the law. On December 31, 2022, Ms. King, raises the issue of their son's tuition and related costs at RIT. In response, in all caps Defendant Bellavia types, *"NO MORE VIOLATIONS."* In this series of texts, he also claims that Ms. King is trying to *"shake him down."* Ms. King responds, *"Contacting you regarding concerns connected our children are NOT*

9

*illegal or violations! I am going to mark January 9th on my calendar as the next visitation since you are unavailable during those weekdays. I am logging off until then."*

43. Defendant Bellavia, nonetheless, continued to pretend that Ms. King was calling him and using the application incorrectly. In a final series of texts over the next month, Defendant Bellavia claims (without evidence) that Ms. King was trying to call him to harass him and using the parenting application incorrectly.

44. On January 8. 2021 he texts, *"You are going to get in trouble."* Ms. King never called him, other than her having her son call him after repeated attempts to obtain health insurance information via the parenting application had failed. Accordingly, Ms. King explained on December 31, 2021*, "I haven't called you or had any non-children contact related with you, nor do I have a desire to call you. I only wanted the health insurance information you wouldn't give."*

45. And then, after another month of strange texts from Defendant Bellavia, on January 25, 2022—the day before Ms. King was called by Officer Corey Black to be arrested—she texted*, "All of my communication is about our children. I text you about their health, well-being, and care, instead of cooperating, each time you threaten me on this app about an order. All that matters to me is to keep my children safe and happy. I want as little contact with you as possible."*

46. The day of her unjust arrest, Ms. King texted to update Defendant Bellavia on the children's development stating, *"Basketball is resuming, we find out day to day when clinics will be."* Defendant Bellavia responded without a hint of his actions to have Ms. King arrested, simply saying, *"Thanks."*

10

**C.    Defendant Bellavia was the aggressor, but he used his friend and political associate Investigator Corey Black to arrest, silence, intimidate, and defame Ms. King.**

47.    On January 26, 2021, Defendant Investigator Black called Plaintiff, falsely stated he was from Orleans County Sheriff's Department, and informed Plaintiff there was a warrant out for her arrest for harassment in Orleans County.

48.    Plaintiff does not live in and rarely travels to Orleans County. Orleans County, however, is the location of Defendant Bellavia's former childhood home and the current location of many of his friends and acquaintances, including Defendant Investigator Black.

49.    Plaintiff suspected the call was a prank, so she hung up and called the Defendant Orleans County Sheriff's Department directly asking if the call was "real." She also asked, "Is there a warrant out for me?" Defendant Orleans County Sheriff's Department refused to answer Plaintiff.

50.    Plaintiff was scared and confused. She called her brother-in-law, an Undersheriff in Genesee County where she lives, and her brother-in-law confirmed that Defendant Investigator Black called the Genesee County Sheriff's Department and asked if them to send a car to Plaintiff's house, arrest her, and transport her to Orleans County.

51.    Defendant Investigator Black agreed to allow Plaintiff to turn herself in the next day if her brother-in-law escorted her. Defendant Investigator Black claimed this was a "professional courtesy" to him.

52.    Hearing this, Plaintiff called Defendant Investigator Black and asked for more information. He said that he could not explain the details, but he was offering her an opportunity to turn herself in voluntary because she is sister-in-law to a Genesee County Undersheriff.

53.    Plaintiff was alone with her minor children when Defendant Investigator Black asked police to come and arrest her. Panicked, Plaintiff made arrangements to have her children

11

looked after and made the long drive to Orleans County the next day, accompanied by her brother-in-law.

54. Driving, she contemplated the long-term damage news of her arrest would cause to her children. She also contemplated the negative impact it could have on her career in entertainment and her general reputation.

55. In Orleans County, Plaintiff was arrested, fingerprinted, and forced to take a mug shot.

56. She met with Defendant Investigator Black in a room in the Orleans County Public Safety Building.

57. At this point, Plaintiff believed that Defendant Investigator Black was a Deputy from the Orleans County Sheriff's Department, which he was not. According to his own public LinkedIn profile, Investigator Black had not worked with the Orleans County Sheriff's Department since 2014.

58. Investigator Black previously worked with the Orleans County Sheriff's Department for over twenty years and would not have followed through with such an arrest if he was not conspiring with Defendant Bellavia.

59. Plaintiff asked why she was being arrested, and Defendant Investigator Black showed her a screen shot of Defendant Bellavia's phone log documenting a call from the couple's minor son regarding an issue with health insurance coverage. A screen shot of phone calls from Defendant Bellavia's son is not sufficient evidence to arrest Ms. King for harassment in the second degree.

60. Furthermore, a mother needing the updated insurance information for a doctor's appointment, Defendant Bellavia was made aware of in advance, is a legitimate reason for contact. It does not meet any requirements under the law to be considered harassment in the second degree.

61. Defendant Investigator Black also showed Ms. King a message dated January 7, 2021, on AppClose from the Plaintiff requesting that Defendant Bellavia get a COVID test before the next visit with their children. The children were not yet vaccinated. Again, this communication was for a legitimate purpose. Ms. King, like most parents, was trying to protect her children during a deadly pandemic. It was not harassment, but rather Investigator Corey Black conspiring with Defendant Bellavia to invent evidence for an arrest.

62. When Plaintiff expressed disbelief, Defendant Investigator Black cryptically and rather threateningly responded, "There's more to it than that, but David didn't want to pursue it,

63. Defendant Investigator Black then confirmed that he and Defendant Bellavia are good friends. Defendant Bellavia and Investigator Corey Black were also friends on Facebook. In one post Investigator Black wrote, "Happy Birthday…God Bless." to Defendant Bellavia.

64. Plaintiff met alone with Defendant Investigator Black and her brother- in-law except for the brief period when Defendant Investigator Black read the charges against her. At that time, a Deputy, Defendant John Doe, entered the room. He did not say anything, and Plaintiff was never apprised of his name.

65. Defendant Investigator Black knowingly engaged in the above conduct without probable cause for Plaintiff's arrest.

66. Defendant Deputy John Doe engaged in the above conduct with the knowledge that Defendant Investigator Black is not a Sheriff's Deputy.

67. Defendant Deputy John Doe knowingly engaged in the above conduct without probable cause for Plaintiff's arrest.

68. Defendant Orleans County permitted Defendant Investigator Black and Defendant Deputy Doe to arrest Plaintiff without probable cause.

69. Defendant Orleans County permitted Defendant Investigator Black and Defendant Deputy Doe to arrest Plaintiff at the instigation of Defendant Bellavia as a personal and/or political favor.

70. Plaintiff, who had never broken a law in her life, then faced her arraignment before the court.

71. Of note, the courts were not critical of Ms. King's behavior in January 2022, as routine review of these text exchanges (and the others cited in our complaint) would have demonstrated to any law enforcement.

72. An arrest in Orleans County would mean a protective order would be issued and the plaintiff would not be able to speak of Defendant Bellavia's abuse for fear of being arrested again. It also hurt the Plaintiff's reputation discrediting allegations of abuse. Defendant Bellavia did not contact the Orleans County Sheriff's Department to file a report.

73. The Orleans County Sheriff's Department would normally handle a misdemeanor harassment claim. The two defendants' relationship shows the elements needed to show a plausible conspiracy between a state actor and a non-state actor, namely a relationship between the parties. Defendant Black and Defendant Bellavia are fellow travelers in the same political circles.

74. They worked together on political campaigns; indeed, they worked at least in some concert on Defendant Bellavia's own political endeavors to run for Congress.

75. On his own LinkedIn page, Defendant Black clearly states that he is a "former" sheriff's deputy. Further, according to his own self-created profile, he has not worked for the Orleans County Sheriff's Department since 2014, nearly seven years

76. Even if he had the authority to arrest Plaintiff King, at the very least, given the prior relationship between Defendant Bellavia and Defendant Black, and even if he was the only officer

14

on duty within a 50-mile radius (which he was not) it would have been appropriate and ethical for Defendant Black to have the arrest handled by an Orleans County officer.

77. Under no normal circumstances had Defendant Bellavia simply called the police would his friend, Defendant Black--who worked not as a police officer but for the district attorney's office in a felony crimes unit related to illegal narcotics (in a county where neither Defendant Bellavia nor Plaintiff King lived) respond to a misdemeanor harassment charge related to divorce proceedings.

**D.    Defendant Bellavia continued to work with Defendant Investigator Corey Black in the months to come to silence, discredit, and defame Ms. King and deny her of her civil rights.**

78. Defendant Black's unlawful arrest of Plaintiff King, Defendant Bellavia continued to coordinate with Defendant Black to fulfill his long-established effort to silence, defame, and discredit Plaintiff King using the legal system.

79. When Plaintiff subsequently communicated with Defendant Bellavia, Defendant Bellavia knew details about her arrest including comments she made to Defendant Investigator Black when she was arrested.

80. In addition, Defendant Bellavia lied in a sworn affidavit filed on February 2, 2021, about Ms. King's behavior while in custody. "Also, when in detention in Orleans County, the Defendant threatened police officers, told staff and law enforcement that she would ruin their careers and bring in the media. Her own criminal attorney, her undersheriff brother-in-law and the Defendant herself, all apologized for her outrageous and unprofessional behavior. Her behavior was so unhinged, the arresting officer needed to bring in another off-duty officer and set up the video camera as back up."

81. Defendant Bellavia also wrote in the signed affidavit, "Investigator Corey Black has stated that not only did the Defendant threat to file a report on him but also involved our

15

children in the original call. She was screaming, crying and worked the kids up to lather. At one point, she used our son's cellular phone to record the officer on the telephone and announce to Investigator BLACK in front of our son after asking him for his phone that she was simultaneously recording the Officer. She had her melt down in front of our children caused this emotional damage to them as she has for 20 years."

82. According got testimony given by Ms. King's divorce attorney, District Attorney Joseph Cardone denied these facts ever happened, conversely stating that Ms. King was both professional and polite when in their custody.

83. In the months to come, Plaintiff was required to appear repeatedly in criminal court to address the charges against her. Intimidated and to avoid undue scrutiny and fearful again of possibly biased legal forum Plaintiff agreed to an Adjournment in Contemplation of Dismissal. The charges against Plaintiff have since been dismissed.

84. To this day, she remains haunted by the experience, and fearful of Defendant Bellavia and the Orleans County Sheriff's Department.

85. Defendant Bellavia's attempts to silence, intimidate, and discredit Ms. Bellavia via the legal system, however, continue. On January 12, 2023, Defendant Bellavia brought a separate action in Genesee County asking the court to almost completely take away her free speech by, among other requests, permanently granting, "an order of restraint preventing the defendant from posting on the world wide web under her name Deanna King or "Cynical Mother" her handle on Twitter, Facebook, or Instagram and any other social media platform" disparaging him. Defendant Bellavia even extends his requests for silence and protection to counsel for plaintiff in this case.

16

### AS AND FOR A FIRST CAUSE OF ACTION

**(For Violation of the Fourth Amendment as against Defendants Orleans County, Orleans County Sheriff's Department, Orleans County District Attorney, Corey Black and Deputy John Doe)**

86. Plaintiff repeats and realleges each and every allegation contained in the paragraphs previously set forth.

87. The policies and conduct of the defendants violated her right to be free of unreasonable searches and seizures in violation of the Fourth Amendment to the United States Constitution.

88. As a direct and proximate result of the unlawful policies and acts of the defendants described herein, the plaintiff has incurred economic damage and damage to her reputation and still suffers both physical pain and suffering and psychiatric injury all to plaintiff's damage in an amount which exceeds the jurisdictional monetary threshold of the Court, the specific amount to be proven at trial, plus reasonable attorneys' fees, costs and disbursements.

89. The defendants acted willfully, maliciously and/or with reckless disregard of the consequences of their actions. Accordingly, plaintiff is entitled to an award of punitive damages.

### AS AND FOR A SECOND CAUSE OF ACTION

**(For Violation of the Fourteenth Amendment as against Defendants Orleans County, Orleans County Sheriff's Department, Orleans County District Attorney, Corey Black and Deputy John Doe)**

90. Plaintiff repeats and realleges each and every allegation contained in the paragraphs previously set forth.

91. The policies and intentional conduct of the defendants in furtherance of a personal and/or political vendetta deprived the plaintiff of her right to equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution.

92. As a direct and proximate result of the unlawful policies and acts of the defendants described herein, the plaintiff has incurred economic damage including a loss of gainful employment and damage to his reputation and still suffers both physical pain and suffering and psychiatric injury all to plaintiff's damage in an amount which exceeds the jurisdictional monetary threshold of the Court, the specific amount to be proven at trial, plus reasonable attorneys' fees, costs and disbursements. The defendants acted willfully, maliciously and/or with reckless disregard of the consequences of their actions. Accordingly, plaintiff is entitled to an award of punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION
**(For Malicious Prosecution as Against Defendants Corey Black and John Doe)**

93. Plaintiff repeats and realleges each and every allegation contained in the paragraphs previously set forth.

94. The conduct of the defendant Corey Black and John Doe constituted malicious prosecution because it was carried out in pursuit of a personal vendetta and without any basis in law or fact and without sufficient factual information.

95. As a direct and proximate result of the unlawful acts of the defendants described herein, the plaintiff has incurred economic damage including a loss of gainful employment and damage to his reputation and still suffers both physical pain and suffering and psychiatric injury all to plaintiff's damage in an amount which exceeds the jurisdictional monetary threshold of the Court, the specific amount to be proven at trial, plus reasonable attorneys' fees, costs and disbursements.

96. The defendants acted willfully, maliciously and/or with reckless disregard of the consequences of their actions. Accordingly, plaintiff is entitled to an award of punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION

### (Conspiracy Under § as Against Defendants Corey Black, John Doe and David Bellavia)

97. Plaintiff repeats and realleges each and every allegation contained in the paragraphs previously set forth.

98. The conduct of the defendants Corey Black, John Doe and David Bellavia constituted conspiracy to violate Plaintiff's constitutional rights because the aforenamed defendants agreed to act together to effectuate Plaintiff's arrest, in pursuit of a personal and/or political vendetta, to inflict Constitutional injuries upon Plaintiff, and by the overt act of knowingly causing her to be arrested and prosecuted without probable cause. By acting as aforedescribed, Defendant has violated the Constitution.

## JURY TRIAL DEMANDED

99. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter judgment awarding Plaintiff:

a. compensatory damages, jointly and severally, in an amount to be determined at trial;

b. punitive damages against all individual defendants in an amount to be determined at trial that will deter such conduct by defendants in the future;

c. pre-judgment and post-judgment interest and recovery of his costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

d. attorneys' fees and cost; and

e. such other relief as the Court finds equitable.

Dated: Buffalo, New York
       January 23, 2023

                                            ADVOCATES FOR JUSTICE,
                                            CHARTERED ATTORNEYS
                                            Attorneys for Plaintiff

                                            By: /s/ *Nathan McMurray*
                                                Nathan McMurray
                                                225 Broadway, Suite 225
                                                New York, New York 10007
                                                (212) 285-1400/917-923-8136
                                                Email: nmcmurray@advocatesny.com